CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
September 29, 2026
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **ISAAC MONTOYA,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:24cv00544** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **LARRY COLLINS, et al.,** | ) | **By: Robert S. Ballou** |
| **Defendants.** | ) | **United States District Judge** |

Plaintiff Isaac Montoya, a Virginia inmate proceeding *pro se*, has filed a complaint against defendants Collins, Duncan, and Fleming, pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to health and safety, gross negligence, intentional infliction of emotional distress, and supervisory or bystander liability, arising from alleged unsanitary conditions at Red Onion State Penitentiary which caused Montoya to develop what he believes to be scabies. The defendants have filed a Motion for Summary Judgment in their favor. For the reasons stated below, the Motion for Summary Judgment will be granted in part and denied in part.

## I. Standard of Review

In ruling on a motion for summary judgment under Rule 56, the court must determine whether there is a genuine dispute over a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the trial. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence presented would allow a reasonable factfinder to find in favor of the non-moving party. *Bhattacharya v. Murray*, 93 F.4th 675, 686 (4th Cir. 2024). The court must draw all reasonable inferences from the evidence in favor of the non-moving party; the court may not

consider the weight of the evidence or credibility of the parties, because that is the function of the factfinder. *Alexander v. Connor*, 105 F.4th 174, 178−79 (4th Cir. 2024).

When a party files a motion for summary judgment, the non-moving party may not simply rely on matters pleaded in the complaint, but must, “by factual affidavit or the like, respond to the motion.” *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021). However, a verified complaint, which Montoya filed, is the equivalent of an affidavit, for summary judgment purposes, when the allegations therein are based on personal knowledge. *Id.* Further, *pro se* litigants are entitled to liberal construction of their complaint, including any documents filed with and attached to the complaint, to the extent they are based on the party’s own knowledge. *Pendleton v. Jividen*, 96 F.4th 652, 656 (4th Cir. 2024).

## II. Factual Allegations

In his verified complaint, Montoya alleged that defendants Collins, Duncan, and Fleming were aware of the inhumane conditions and lack of sanitation in the prison pods and recreation yard that caused Montoya’s injuries (which he alleged to be scabies). Montoya alleged that sanitation of showers, pods, and rec cages was not being done. Vents contained feces and urine which were not cleaned out. The defendants were aware of this problem because Montoya filed several complaints about it and tried to file grievances, as well, many of which were attached to his Complaint.

On March 21, 2024, he filed a Written Complaint alleging that he was moved into cell M-2 on March 12, 2024, and the mattress and floor were saturated in urine. Dkt. No. 1-1, p. 18. He complained on March 21, 2024, that the recreation cages outdoors were covered in bird and human feces, and had been so covered for two years, which can lead to disease. Still Aff., Encl. I, Dkt. No. 56, p. 56. He filed a grievance on April 2, 2024. Dkt. No. 1-1, p. 26. On April 2,

2024, Montoya complained (followed by a grievance on April 18) that he was moved on March 28, 2024, to a cell with dried feces leaking from the air vent. Despite his objections to the unclean cell, he was not permitted to move to one of the five available cells that were clean. *Id.* at p. 22–25. On April 3, 2024, he complained that in addition to feces on the vent, he awoke that morning to an overflowing toilet "shooting out sewage and urine on the floor," leaving at least an inch of sewage on the floor. When he notified defendant Collins and other officers of the situation, C.O. Childress moved the sewage along to the shower drain but did not decontaminate the cell floor nor call for a biohazard crew to clean it up. *Id.* at 27–30. The written complaints on April 2 and April 3 specifically mentioned Collins as a person Montoya spoke to about the situation. The April 2 complaint was directed to Unit Manager Collins (UM-C) for a response, and the April 3 complaint was directed to and responded to by defendant Duncan.

Montoya named other inmates who had filed complaints about the unsanitary conditions, which he alleges further put the defendants on notice of the sanitation problem. Montoya alleged that defendant Collins was the unit manager of C-Building throughout the times alleged in his complaint, and that as Unit Manager, Collins had an obligation to maintain humane conditions in the unit that would not harm inmate health or safety. Defendant Duncan, as chief of housing, had an obligation to make sure all housing units "are up to par." Finally, he alleged that defendant Fleming, an active lieutenant for the C-building, was responsible for insuring upkeep and cleaning of the cells, pods, and recreation cages in the building.

## III. Discussion

To rule on the defendants' motion, the court must consider what must be shown for each claim and whether the evidence, in the light most favorable to the plaintiff as the non-moving party, creates a genuine issue of material fact that is relevant to the claim.

**A. <u>Deliberate Indifference to Health and Safety</u>**

To establish a claim that prison conditions violate an inmate's Constitutional right to health and safety under the Eighth Amendment, a plaintiff must show (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendants acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citations omitted). To meet the first element, a prisoner must show that the challenged prison conditions caused, or created a serious risk of causing, significant physical or emotional harm. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). To establish the second element, a plaintiff must show that the defendants knew about the conditions alleged, recognized the risk that the conditions posed, and knew that their actions were inappropriate in light of the risk. *Farmer*, 511 U.S. at 838−40. Whether the defendant had the requisite knowledge is a question of fact, "subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a [defendant] knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

**1. Cell Conditions**

Courts in this Circuit and elsewhere have recognized that leaving a prisoner in a cell containing human waste can be sufficiently dangerous to an inmate's health and safety to satisfy the first element. *E.g., Williams v. Griffin*, 952 F.2d 820, 825 (4th Cir. 1991) (holding that plaintiff's factual allegations of a cell toilet "constantly coated with urine" from use by 12 inmates in the cell and of sewage on the floor to the showers from overflowing toilets, were sufficient to survive a motion for summary judgment); *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004) (affirming finding of Eighth Amendment violation based on filthy living conditions,

including fecal matter and urine in cells); *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) ("Not surprisingly, human waste has been considered particularly offensive so that courts have been especially cautious about condoning conditions that include an inmate's proximity to it."). Several circuit courts have held that *placing* an inmate in a cell with human waste can constitute an Eighth Amendment violation. *See Gates*, 376 F.3d at 338, and cases cited therein.

Defendants rely on the affidavit of Assistant Warden Duncan, previously Chief of Housing and Programs at Red Onion, who is also a defendant in this suit. Duncan states categorically that "[n]o inmates at ROSP are placed in contaminated cells or cells with feces in them." Dkt. No. 72-1, ⁋ 4. Duncan then states that "typically" all vacant cells are cleaned and sanitized by inmate workers before a new inmate is moved into the cell, but if inmate workers are unavailable, staff members will clean the cell. All cells are also inspected before inmates are housed in them, and inmates are provided with appropriate cleaning supplies and disinfectants to clean their own cells. Duncan also attached Montoya's Individual Inmate Log and Activity Tracking Sheets from January 2023 through July of 2024, which "document the inspection and cleaning of his cells." *Id.*

Duncan's statement that no inmates are placed in contaminated cells or cells with feces in them is conclusory, and unless Duncan is personally present every time an inmate is placed in a different cell, the statement does not appear to be based on personal knowledge, specifically not on personal knowledge of cells that Montoya was placed in. Summary judgment affidavits must contain admissible evidence based on personal knowledge. Fed. R. Civ. P. 56(c)(4). Conclusory statements are not appropriate for summary judgment affidavits. *Simmons v. Whitaker*, 106 F.4th 379, 386 (4th Cir. 2024). More importantly, even accepting such evidence, there still remains a highly material question of fact: Montoya states in his verified complaint and its attachments that

he *was* moved into one cell soaked with urine on and around the mattress; he objected to being placed in another cell later because dried feces in the air vent were dripping into the cell. He awakened one morning to plumbing problems causing his toilet to spew contaminated toilet water and waste onto his floor. If the jury believes Montoya's version of events, that would support a finding of conditions that create a serious risk of physical or emotional harm to inmates.

Defendants focus on Montoya's complaint of scabies, which he did not have according to the medical evidence, as proof that the claim must fail. This argument overlooks two points. First, as a matter of law, when presenting a claim for cruel and unusual conditions of confinement, plaintiff need not prove actual injury; it is sufficient if he shows that the conditions create a serious risk of causing serious physical or emotional harm. *Shakka*, 71 F.3d at 166. Second, although Montoya did not have scabies, he had raised lesions and scabs on his face, neck, hands, and stomach, for which the medical department prescribed an antibiotic ointment on February 8, 2023. Holbrook Aff., ⁋⁋ 23, 24. On March 28, he still complained of a rash, and Holbrook observed "multiple scars on his face and scalp." *Id.* at ⁋ 27. On August 7, 2023, Dr. Smith observed lesions on Montoya's skin and prescribed Permethrin[1] plus d-cerin lotion. *Id.* at ⁋ 32. On September 26, 2023, Dr. Smith saw Montoya again for complaints of a rash on his neck and scalp, which the doctor documented as dermatitis and prescribed selenium sulfide. *Id.* at ⁋ 33. Yet, Montoya continued to present with rash and itching. By May 2024, Montoya was approved for an outside consult with a dermatologist "[d]ue to persistent rash and failed previous treatments." Def. Resp. to Disc., Dkt. No. 29-3 at 131. Montoya continued to have problems. On August 21, 2024, Holbrook observed lesions on Montoya's eyelids and ears. She prescribed

[1] Permethrin is a topical antiparasitic cream. GoodRx, *What is Permethrin Used for?*, https://www.goodrx.com/permethrin (https://perma.cc/UGE3-A8SA) (last visited Sept. 29, 2026).

Bactroban and Clobetasol, "a topical cream used to treat inflammation, itching, and other irritation of the skin." Holbrook Aff., ⁋ 37. She continued treating Montoya in September and October 2024, including with a round of Doxycycline to prevent or treat any infection. *Id.* at ⁋⁋ 38, 39. Whether Montoya had scabies, lice, dermatitis, or infection from scratching, the issue is whether his condition was causally related to the conditions he claims existed. Even if he cannot show a causal relationship with his skin condition, he only needs to show that the conditions created a serious *risk* of physical or emotional harm.

Turning to the second element, I must look at whether any evidence supports that the defendants knew the condition existed, knew the risk of harm, and knew that their actions or inactions were inappropriate in light of the risk. One can infer that the defendants knew that confining prisoners in cells with urine, fecal matter, or sewage creates a serious risk of physical or emotional harm because that is obvious. The Supreme Court stated in 2020 that "no reasonable correctional officer could have concluded that . . . it was constitutionally permissible to house [a prisoner] in such deplorably unsanitary conditions for such an extended period of time." *Taylor v. Riojas*, 592 U.S. 7, 8−9 (2020) (per curiam) (discussing allegations that plaintiff was confined in a cell covered with "massive amounts of feces" for four days).

One can infer that defendants Collins and Duncan knew about the alleged conditions based on Montoya's alleged conversations with Collins, the written complaints against Collins, and the grievance that Duncan responded to. What actions they personally took when notified of the allegations, if any, is a disputed material fact, as is whether they knew their response to the conditions was inappropriate.

The Individual Inmate Log and Activity Tracking Sheets document Montoya's routine activities on a daily basis: Meals accepted, out-of-cell exercise, showers offered or taken, mail

sent or received, medical or counselor contacts, medication taken, and other information, an entire week on each sheet. Cell inspection "(each time offender is removed from the cell)" is initialed on days when Montoya left the cell. The purpose of the inspection is unclear from the form—whether it is to check for cell cleanliness or for weapons or other contraband (given that the inmate is also searched whenever leaving his cell). Cell cleaning (accepted or refused) is not entirely self-explanatory, either. Duncan's affidavit asserts that cells are inspected and cleaned by inmate workers or by staff before a new inmate is placed in the cell, but there is no mention of workers coming daily or weekly to clean cells while the inmate resides there. More likely, "cell cleaning" on the individual daily logs reports whether an inmate accepted cleaning supplies, as Duncan stated inmates were given cleaning supplies to maintain the cleanliness of their own cells. Montoya's logs show that he accepted cleaning supplies when offered. What is not provided is documentation of cleaning by inmate workers or by staff when inmates are removed from a cell before another inmate is placed inside.

Whether providing cleaning supplies to an inmate to clean another person's excrement out of a cell is a sufficient response to the risk created by the unsanitary condition is also a question of fact. *See Clark v. Daddysman*, No. TDC-16-0921, 2018 WL 1453333, at *11 (D. Md. March 22, 2018) (noting that a defense affidavit stating that the inmate was provided supplies to clean the cell created, at most, a genuine issue of material fact regarding whether the unsanitary conditions were sufficient to constitute an Eighth Amendment violation).

Montoya's verified complaint and attachments provide enough evidence of genuinely disputed material facts to overcome the Motion for Summary Judgment on behalf of Collins and Duncan. However, nothing in the complaint or attachments provides facts from which one could infer that Fleming had personal knowledge of the conditions in Montoya's cell. The simple

allegation that he knew is a conclusory statement, not supported by any factual details. I will grant the motion to dismiss this claim against Fleming.

**2. Recreation Cage Conditions**

In his verified complaint Montoya mentioned that he and others had complained about sanitation not being done in the rec cages. Compl., p. 9. There is also a grievance receipt in the attachments to his verified complaint, which states "C206-I have repeatedly asked that the recreation cages be cleaned." Dkt. No. 1-1 at 26. The more explicit written complaint was attached to Still's affidavit, stating that the recreational cages were covered in bird feces and human feces and had not been cleaned for two years. Dkt. No. 56 at 56. Lt. Allen responded to the written complaint by saying the recreation modules were cleaned during construction. That does not provide much information, because he does not say when the construction was done.

In contrast, Duncan summarily states that recreation cages "are cleaned regularly" by inmate workers three times per week, using large trash cans of water mixed with cleaning chemicals to scrub and sanitize the recreation cages. Dkt. No. 72-1, ⁋ 5. She adds that "[p]eriodically and weather permitting," a pressure washer is used to clean the cages. *Id.* The statements are not supported by documentation showing the dates of such cleaning or the inmates responsible for it on any given day, and they appear to describe what is supposed to happen rather than the affiant's personal knowledge of what happened.

While there is a significant disputed fact on the existence of a condition sufficiently serious to create a risk of physical or emotional harm, that is only the first element. The "deliberate indifference" element lacks sufficient admissible evidence that any of the three defendants personally knew the condition of the rec cages and knew that their action or inaction failed to ameliorate the risk of harm to plaintiff. By Montoya's own allegations, Collins,

Duncan, and Fleming are or were higher ranking correctional staff. There is no sworn affidavit that any of them routinely (or ever) personally checked the condition of the rec cages. There is no documentary evidence that Montoya or anyone else filed a grievance that any of the three defendants saw or responded to. There is no allegation that Montoya or any other identified person complained specifically to Collins, Duncan, and/or Fleming about the condition of the rec cage. Without some admissible evidence from which one could infer (not speculate) their actual knowledge, there can be no deliberate indifference.

Having failed to establish the second element of an Eighth Amendment prison conditions claim regarding the recreation cages, I will dismiss that portion of the prison conditions claim.

**B. <u>Supervisory/Bystander Liability</u>**

Supervisor liability is a misnomer in the context of § 1983 lawsuits. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Government officials may not be held vicariously liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*; a government employee is liable only for his or her own misconduct. *King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023). Liability under § 1983 is personal, based upon a defendant's own misconduct. I have analyzed the prison condition claims based on whether some evidence shows the defendants' personal knowledge of constitutionally inadequate prison conditions and knowledge that their actions were insufficient. There are not sufficient factual allegations to support what is unartfully called a supervisory liability claim against Collins and Duncan nor is there sufficient evidence to support a bystander liability claim against Fleming.

To establish supervisory liability for a subordinate's unconstitutional actions, an inmate must show that (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed an unreasonable risk of constitutional injury to someone like the

plaintiff; (2) the supervisor's response to that knowledge was so inadequate that it showed deliberate indifference to or tacit authorization of the subordinate's unconstitutional behavior; and (3) a causal relationship between the supervisor's inaction and the constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Montoya did not identify a particular lower ranked officer who was deliberately indifferent to his cell conditions. To the extent potential liability exists against Collins and Duncan, it must be based upon their own knowledge of the conditions and their knowledge that they were not responding appropriately to the unconstitutional conditions.

Bystander liability requires evidence that a defendant knows that a fellow officer is violating an inmate's rights, has a reasonable opportunity to intervene and prevent the harm, and chooses not to do so. *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002). There is no bystander liability unless an officer is present to see and know that another officer is violating an inmate's rights at that moment, such that he may intervene and stop the misconduct. The theory does not apply to Fleming (or either of the other defendants) because Montoya is not complaining of active misconduct by a person, such as excessive force, that someone can step in and stop. Rather, Montoya complains of unconstitutional conditions that exist. A defendant who knows the condition exists, knows that the condition is endangering an inmate, and knows that he is failing to do anything about it is liable for his own misconduct. That is not a bystander liability situation.

I will dismiss the bystander and supervisory liability claims.

**C. <u>Gross Negligence</u>**

Gross negligence arises as a pendant state law claim, rather than a constitutional claim under § 1983. Gross negligence is a higher degree of negligence, a level of inattention to

another's safety that would "shock fair-minded persons," but something less than intentional or reckless conduct; whether gross negligence has been established is ordinarily a factual question to be decided by a jury. *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016). When plaintiffs state a claim for deliberate indifference under § 1983, "they likewise state a claim for gross negligence under Virginia law." *Sosa v. Hill*, No. 1:24cv499, 2025 WL 864291, at *12 (E.D. Va. March 19, 2025). Further, a claim for gross negligence under Virginia law requires a lower showing than that required to establish deliberate indifference under the Eighth Amendment; gross negligence does not require the jury to find that a defendant subjectively had actual knowledge of a substantial risk, only that he *should* have been aware of that risk. *Hixson v. Hutcheson*, No. 5:17-cv-00032, 2018 WL 814059, at *6 (W.D. Va. Feb. 8, 2018). Accordingly, the same disputed factual issues identified in the discussion of deliberate indifference apply here, and I will deny the Motion for Summary Judgment for defendants Collins and Duncan, but I will grant the motion as to defendant Fleming.

**D. <u>Intentional Infliction of Emotional Distress</u>**

Under Virginia law, four elements are required to prevail on the tort of intentional infliction of emotional distress: (1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the defendant's conduct and the claimed emotional distress; and (4) the emotional distress was severe. *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006). Because injury to the mind or emotions can be easily feigned, intentional infliction of emotional distress is not a favored cause of action in Virginia. *Ruth v. Fletcher*, 377 S.E.2d 412, 415 (Va. 1989).

The first element requires evidence that the defendant had the specific purpose of inflicting emotional distress (intentional) or that the defendant intended his specific conduct

when he knew or should have known that emotional distress would likely result (reckless). *Dixon v. Denny's, Inc.*, 957 F. Supp. 792, 796 (E.D. Va. 1996). I will assume without deciding that the allegations discussed under deliberate indifference are sufficient to support finding at least reckless conduct by Collins and Duncan.

The second element is satisfied if the defendant's conduct was so outrageous in character, and so extreme in degree, that it is beyond all bounds of decency, atrocious, and utterly intolerable in a civilized community. It is for the court to determine as a matter of law whether conduct may be regarded as outrageous and intolerable. The requirement is intended to limit frivolous suits and avoid litigation over bad manners and mere hurt feelings. *Harris*, 624 S.E.2d at 33. Again, I will assume without deciding that being placed in a cell soaked in urine or in a cell with fecal matter dried in the vents is sufficiently outrageous and intolerable.

Causal relationship between the defendant's conduct and the claimed emotional distress is self-explanatory. Such causal relationships must be shown to recover for any tortious injury.

The final element, severe emotional distress, must be "so severe that no reasonable person could be expected to endure it." *Russo v. White*, 400 S.E.2d 160, 163 (Va. 1991). Montoya has identified his emotional damages, alleging that he has major mood swings, depression, irritability, lack of concentration, inability to complete unspecified daily activities, loss of sleep, and constant fear for his safety and that he might contract serious illness. Dkt. No. 1, pp. 11-12. However, those damages do not constitute emotional distress "so severe that no reasonable person could be expected to endure it" according to the case law. *See Russo*, 400 S.E.2d at 163 (holding that plaintiff's complaints of nervousness, inability to sleep, stress and its physical symptoms, withdrawal from activities, and inability to concentrate were not sufficiently severe); *Harris*, 624 S.E.2d at 34 (holding that plaintiff's symptoms of nightmares, difficulty

sleeping, loss of self-esteem, depression, need for additional psychological counseling, humiliation, shame, disgrace, and injury to reputation were not sufficiently severe); *Earley v. Marion*, 540 F. Supp. 2d 680, 689 (E.D. Va. 2008) (finding allegations of renewed anxiety, resumption of anti-anxiety medication, and 10 pounds of weight loss were insufficient to constitute severe emotional distress); *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 436 (E.D. Va. 2006) (finding that allegations of nervousness, stress, and inability to adequately sleep and eat were insufficient to show severe emotional distress); *Dixon v. Denny's, Inc.*, 957 F. Supp. 792, 796 (E.D. Va. 1996) (concluding that feeling fearful and degraded, suffering headaches, and vomiting were not sufficient to show severe emotional distress).

Because Montoya's emotional symptoms are not sufficiently severe to establish severe emotional distress, I will dismiss his claims for intentional infliction of emotional distress. This does not in any way minimize these alleged consequences; Montoya is free to seek compensation for these damages as part of his deliberate indifference and gross negligence claims, but they do not suffice to support a separate claim for intentional infliction of emotional distress under Virginia law.

## IV. Conclusion

For the reasons stated, I will grant the Motion for Summary Judgment in its entirety as to defendant Fleming. As to defendants Collins and Duncan, I will grant the Motion for Summary Judgment on Montoya's claims for supervisory liability, intentional infliction of emotional distress, and for deliberate indifference/gross negligence regarding the recreation cages. I will deny the motion on the claims for deliberate indifference and gross negligence regarding the alleged conditions in his cell.

An appropriate order will be entered this day.

Entered: September 29, 2026

*Robert S. Ballou*

Robert S. Ballou
United States District Judge